FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR 15  AM 7: 25

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANTHONY P. CUCINELLA                    CIVIL ACTION

VERSUS                                  NUMBER: 04-2979

JO ANNE B. BARNHART,                    SECTION: "N"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") under Title II and Part A of Title XVIII of the Social Security Act.  (Rec. docs. 12, 13).

Anthony Cucinella, plaintiff herein, filed his application for DIB on June 24, 2003, alleging disability as of September 12, 2002. (Tr. p. 68).  In a Disability Report completed by plaintiff on June 20, 2003, he identified left knee and lower back pain as the conditions resulting in his inability to work. (Tr. pp. 76-85).

Fee_____
Process_____
Dktd_____
CtRmDep_____
Doc. No_____

Those conditions occurred as a result of a work-related incident on July 24, 2002, which allegedly caused plaintiff's immediate disability.   Plaintiff attempted to return to work on light duty after his accident until he underwent surgery on September 12, 2002, after which he stopped working entirely.  (Tr. p. 77).

Plaintiff's application for DIB was denied at the first step of the Commissioner's administrative review process on July 9, 2003.  (Tr. p. 50).  Pursuant to plaintiff's timely request (Tr. p. 55), a hearing de novo before an Administrative Law Judge ("ALJ") went forward on April 27, 2004, at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 25-49).   On May 28, 2004, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 14-20).  The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 4-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

> 1.  [b]ased upon facts developing subsequent to the decision of the ALJ, there is insufficient evidence to determine that the plaintiff is not disabled.

2.    [t]he ALJ failed to apply the appropriate Listing of Impairments which would have resulted in a finding of disability for plaintiff.

3.    [t]he ALJ erred in failing to consider the extent of plaintiff's pain in making a decision denying plaintiff disability.

(Plaintiff's memo, p. 4).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.    [c]laimant met the disability insured status requirements of Title II of the Act on the alleged onset date and remains insured through December 30, 2005.

2.    [t]here is no proof that claimant has engaged in substantial gainful activity at any time relevant to this decision.

3.    [c]laimant has impairments (Grade 4 chondromalacia, chronic patellofemoral syndrome and medial synovial plica of the left knee, disc herniation at L1-2 and disc protrusion at L5-S1) which impose more than minimal limitations on his ability to perform regular work-related activities and are "severe" within the meaning of Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and SSR 96-3p.

4.    [t]he medical evidence fails to demonstrate that claimant's impairments, whether considered singly or in combination, meet or equal the criteria of any impairment described at 20 C.F.R. Pt. 404, subpt. P, App.1.

5. [c]laimant's testimony did not establish the existence of disabling limitations and was not entirely consistent with the medical evidence.

6.    [c]laimant is 28-years old, which is defined as a younger individual.  He has a high school education and truck driver training.  He has past relevant work as an auto mechanic, driver, sheriff's deputy and construction laborer.

7.    [c]laimant retains the residual functional capacity to

3

perform sedentary work.

8.   [b]ased  on  the  above  residual  functional  capacity,
claimant is unable to perform his past relevant work.

9.   [g]iven  the  above  vocational  profile  and  residual
functional  capacity,  the  vocational  expert  identified  the
following jobs existing in significant numbers in the state
and  national  economies  which  claimant  is  capable  of
performing: cashier, telephone operator and general office
clerk.

10.   [c]laimant has not been under a "disability" as defined
in the Social Security Act at any relevant time through the
date of this decision.

(Tr. pp. 19-20).

Judicial review of the Commissioner's decision to deny DIB is
limited under 42 U.S.C. §405(g) to two inquiries: (1) whether
substantial  evidence  of  record  supports  the  Commissioner's
decision, and (2) whether the decision comports with relevant legal
standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992);
Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v.
Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's
findings are supported by substantial evidence, they are conclusive
and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales,
402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial
evidence is appropriate only if no credible evidentiary choices or
medical findings exist to support the Commissioner's decision.
Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial
evidence is more than a scintilla, less than a preponderance, and

4

is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.3d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

5

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n. 5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F. 2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

Plaintiff was the first witness to testify at the administrative hearing held on April 27, 2004. He was twenty-eight

years of age at the time, had a high school education and had past relevant work experience as a truck driver, mechanic, deputy sheriff and construction worker. (Tr. pp. 31, 46). Plaintiff acknowledged that doctors rendering reports pertaining to his physical condition were physicians designated by his former employer's Worker's Compensation carrier. (Tr. p. 29). At the time of his injury, plaintiff was working as a delivery driver for Pepsi and had been fired from that position once he became disabled from continuing his job duties due to his accident.  (Tr. pp. 30, 31).

At the time of the hearing, plaintiff was taking Soma on occasion but not utilizing routine prescription medications. Rather, he relied upon Advil and Tylenol for pain relief.  He expressed problems with obtaining approval from the compensation carrier for allegedly needed drugs. (Tr. p. 32).  Plaintiff acknowledged that Dr. Murphy, the orthopedic surgeon chosen by the compensation carrier to treat him, had opined that plaintiff could perform sedentary work.  However, plaintiff testified that he disagreed with the doctor in this regard. (Tr. p. 29).

Plaintiff testified that he could not work due to pain in his back because it was difficult for him sit.  Additionally, pain in his legs made it hard for him to stand.  According to plaintiff, his back locked up or froze on him on occasion, resulting in his inability to move.  Furthermore, his leg would give out

7

periodically, causing him to fall on his face. (Id.).

Plaintiff's daily activities involved staying mostly at home, where he lays on the sofa and watches television.  He is married but without children.  Plaintiff is now unable to do housework, yard work or go fishing, whereas, before his injury, he could fish, hunt, bowl, cut grass, garden and do a variety of other activities. (Tr. pp. 33, 42).  He finds now that he sleeps a lot. (Tr. p. 33). According to plaintiff, he complained about his back for two years before the compensation carrier's doctor allowed him to see anyone for his condition. (Tr. p. 34).  As for his knees, he has undergone surgeries and physical therapy and, for the present, his back pain is more of a problem than his knee discomfort. (Tr. pp. 35-37).  He further testified that his back pain was worse than his knee pain from the start (Id.).  But the doctor chose to concentrate on treating his knees first. (Tr. p. 37).

Plaintiff likewise advised that he has constant pain in his knees, that they are swollen continually and that they "feel like [his] heart's beating in them" at night. (Tr. pp. 37-38).  He described tightness, burning and numbness in the back area and tingling in his legs.  (Tr. p. 39). It is plaintiff's understanding that an MRI had revealed a "blown out" disc in his back. (Id.). On a scale of one to ten, plaintiff ranked his back pain as a nine and his knee pain as a six when seated and an eight when standing. (Tr.

p. 40).  At the time of the administrative hearing, plaintiff had
not yet been referred to a pain management specialist for
assessment.  Plaintiff, however, reiterated that he cannot work
because he is in too much pain, he gets only three to four hours of
sleep per night and he simply cannot get comfortable because of his
pain.  (Tr. p. 43).

The next witness to testify at the administrative hearing was
Patricia Riggle, a VE.  She characterized plaintiff's past relevant
work as an auto mechanic and a sheriff's deputy as medium, skilled
positions; that of driver as a medium, semi-skilled position; and
that of construction worker as from medium to heavy and unskilled
to semi-skilled, depending on his job duties.  (Tr. p. 46).  The
ALJ then queried the VE as to whether an individual who was twenty-
eight years old with a high school education and experience as a
truck driver who was limited to sedentary job duties had work
available in the regional or national economies. The VE answered in
the affirmative, identifying cashier, telephone operator and office
clerk as possible available positions. (Tr. p. 47).  The ALJ then
inquired whether adding further limitations of no squatting,
kneeling, climbing, repetitive stooping, bending or twisting would
affect her opinion.  The VE replied that it would not.  (Id.).

In follow-up to the questioning of the ALJ, plaintiff's
counsel asked the VE if plaintiff's job opportunities would be

9

affected if he had to lie down for any portion of an eight hour work day due to pain. (Tr. p. 47). The VE responded that it would because employees were not allowed to lie down during the work day. (Tr. p. 48).

Medical records pertinent to plaintiff's treatment reflect that he was seen by Dr. Ivan Altman at Concentra Medical Center on July 24, 2002, the date of his initial injury. At that time he complained that he had felt a pop in his left knee which caused him to fall several feet and hurt his back. He denied having had prior knee or back problems before this fall. It was noted that he had a restricted range of motion in twisting and that he appeared in discomfort but that the range of motion in the knee was good. Lumbosacral and knee strain were noted. Naproxen, Skelaxin, Propoxyprene and Darvocet were prescribed. (Tr. p. 218). On that same date, radiographs of his left knee and lumbar spine were obtained. The impression was of a normal lumbosacral spine; some abnormality was found in the knee for which a bone scan was advised. (Tr. p. 216).

Plaintiff attended his first physical therapy session on July 26, 2002. It was noted that plaintiff put forth good effort in his session and a home exercise program was recommended. (Tr. p. 215). Certain of his movements appeared guarded during his treatment. (Tr. p. 214).

10

On July 29, 2002, plaintiff again saw Dr. Altman at which time he advised that physical therapy was not helping him.  Plaintiff stated that he had gone to three physical therapy sessions and that he could not perform activities due to pain.   (Tr. p. 212). However, on that same day, an activity status report was generated from Concentra Medical Center which indicated that plaintiff could return to work on July 29 th with no repetitive lifting over 20 pounds and no squatting and/or kneeling. (Tr. p. 213).  At his physical therapy session the following day, plaintiff reported that he was not tolerating work-related activity well and the therapist noted slow progress with plaintiff's recovery, with no change in his functional status. (Tr. pp. 210-211).  At his next physical therapy session, it was noted that plaintiff's subjective reporting was inconsistent with the therapist's objective findings regarding functional status because it was felt that plaintiff demonstrated improved functional status.   It was further noted that plaintiff presented with a range of motion within normal limits and no edema to the knee. (Tr. p. 208).

On August 1, 2002, Dr. Charles Murphy, an orthopedist at Concentra Medical Center, cleared plaintiff for modified work activity with restrictions of no repetitive lifting over five pounds, no prolonged standing and/or walking longer than 15 minutes per hour, no pushing and/or pulling over five pounds, no squatting

and/or kneeling, limited use of his left leg and that he should be sitting 80% of the time. (Tr. p. 206). Dr. Murphy recommended a nuclear medicine bone scan and an MRI scan of the left knee; significant mechanical crepitation in the left knee led the doctor to believe plaintiff would require left knee arthroscopic surgery. Conservative treatment of the back was felt appropriate. (Tr. p. 203). Celebrex was added to plaintiff's prescriptions. (Tr. p. 201). By plaintiff's August 9, 2002 visit with Dr. Murphy, the testing referenced above had been performed. (Tr. pp. 156-158). The doctor opined that marked crepitation probably associated with an articular cartilage chondral flap tear in the knee was present. Left knee arthroscopic surgery was recommended. It was also noted that plaintiff had a desmoid tumor in the same knee but the arthroscopy would not address this issue since it was not felt to be work-related. His residual functional capacity for work was deemed to be sedentary only. (Tr. pp. 199-200).

Plaintiff's arthroscopic surgery by Dr. Charles Murphy went forward on September 12, 2002. The post-operative diagnosis was left knee grade IV chondromalacia of the lateral facet of the patella with chondral fragmentation and multiple articular cartilage loose body formation. During the surgery, the doctor performed a left knee arthroscopic shaving of chondromalacia chondral fragmentation involving the patella with removal of all

12

articular cartilage loose bodies.  (Tr. pp. 148-150).  Plaintiff was discharged from the hospital the same day with pain medications and antibiotics.  (Tr. p. 142).

On September 16th, the physical therapist noted limited motion, weakness and pain in plaintiff's knee.  Plaintiff was complaining of increased lower back pain due to changes in weight bearing patterns. (Tr. p. 198).  At his October 23 rd physical therapy session, plaintiff reported significant patellar discomfort, with no help obtained from medication.  Little progress over the prior two weeks was noted. (Tr. p. 195).  On that same date, plaintiff saw Dr. Murphy as a walk-in patient due to pain.  Limited light sedentary work was all plaintiff was capable of performing according to the doctor.  Residual crepitation with significant atrophy of the quadriceps muscle was noted.  Physical therapy was still recommended. (Tr. p. 194).

By November 6, 2002, Dr. Murphy opined that plaintiff could perform modified light work.  Plaintiff was still walking with a limp, his quadriceps muscle still showed atrophy and weakness and crepitation consistent with chondromalacia was noted. (Tr. p. 191). Ultram was added to his prescription medication.  Physical therapy, which plaintiff faithfully attended, was continued.  On December 4, 2002, Dr. Murphy noted that plaintiff's condition was pretty much unchanged, that plaintiff had severe grade IV chondromalacia of the

13

lateral facet of the patella with chondral fragmentation and multiple articular cartilage loose body formation.  Plaintiff's severe pain was documented and he was given a prescription for Darvocet.  (Tr. p. 187).  Synvisc injections for the knee were recommended, to which plaintiff agreed.  (Tr. p. 183).  Those injections began the next day and were administered weekly on three occasions.  (Tr. p. 185).

While religiously continuing his physical therapy appointments in the interim[1]/, plaintiff saw Dr. Murphy again on January 22, 2003. His condition was viewed as unchanged, with only slight improvement from the Synvisc injections.  The doctor noted that plaintiff could not return to his previous work which entailed repetitive squatting and lifting activities.  Dr. Murphy anticipated relative maximum medical improvement in one month.  He noted that the only other available treatments for plaintiff would be drastic procedures which he was not recommending, i.e., autologous chondrocyte surgery and/or patellectomy.  Celebrex and Ultram were prescribed.  However, weight reduction was considered a positive activity which plaintiff could do to lessen the severity of his condition.  (Tr. pp. 169-170).

---

[1]/ As of January 22, 2003, plaintiff had a cumulative total of 50 visits with the physical therapist, having missed only one appointment. (Tr. p. 171).

14

Plaintiff next saw Dr. Murphy on February 19, 2003, at which time his physical condition was unchanged but he reported having lost his job. Dr. Murphy discussed performing a left knee arthroscopy with microfracture technique to the subchondral bone surface along with arthroscopic lateral release. Plaintiff's lack of sleep and pain prompted a trial of amitriptyline. (Tr. p. 166). However, despite his condition and the offer of a second arthroscopic surgery, Dr. Murphy released an activity status report pertinent to plaintiff allowing for his return to work with restrictions. (Tr. p. 167).

Plaintiff's next visit with Dr. Murphy was on March 12, 2003. The doctor noted tenderness in the low lumbar region with limited range of motion of the lumbar spine. Plaintiff's knee remained unchanged. However, he reported some bladder-related symptoms which prompted the doctor to discontinue the amitriptyline. An MRI of the lumbar spine was ordered. Weight reduction was discussed with plaintiff. Plaintiff also reported that he was scheduled to consult with Dr. Terry Habig at the request of the compensation carrier. (Tr. p. 162). Dr. Murphy again opined that plaintiff could work with certain restrictions. (Tr. p. 164).

Plaintiff underwent an MRI scan of his lumbar spine on March 24, 2003. A left foraminal disc herniation at L1-2 causing severe neural foraminal stenosis was noted. Further, a midline and right

15

paramedian disc herniation measuring 0.3 cm at L5-S1 effacing the ventral thecal sac and causing right lateral and neural forminal stenosis was also documented. (Tr. pp. 125-126).

On March 28, 2003, a second opinion from Dr. Terry Habig was obtained by the compensation carrier. Dr. Habig opined that Dr. Murphy's plan to perform another arthroscopy with lateral retinacular release and microfracture of the patella was reasonable. Dr. Habig agreed with the limitations that Dr. Murphy recommended regarding plaintiff's ability to work. Lastly, Dr. Habig opined that, based upon plaintiff's knee condition, his current level of disability was mild-moderate. (Tr. pp. 246-248).

Dr. Murphy authored a report dated April 3, 2003 pertaining to plaintiff's upcoming surgery. He also opined that non-operative conservative management for plaintiff's low back pain was in order, following his review of the aforementioned MRI. Plaintiff was encouraged to lose weight to reduce stress on his spine. As for plaintiff's knee, it was noted that he would require a CPM machine to help stimulate cartilage development on the undersurface of his knee post-surgery. (Tr. pp. 244-245). Vicodin ES and Cephalexin were prescribed. (Tr. p. 242).

On April 14, 2003, plaintiff underwent a left knee arthroscopy and microfracture technique along with arthroscopic lateral release, performed by Dr. Murphy. In that surgery, the doctor

16

shaved the medial synovial plica and the chondromalacia, chondral flap formation on the patella. Debridement of the chondral calcification was performed and the subchondral bone was then prepared for the micro pick procedure which was also executed in the subchondral bone surface of the patella. Good blood flow was achieved from the subchondral bone surface. Lastly, an arthroscopic lateral released was performed. (Tr. pp. 129-130). The diagnosis of plaintiff's condition was left knee grade IV chondromalacia of the patella, left knee chronic patellofemoral syndrome and left knee medial synovial plica. (Tr. p. 129). Tissue samples gathered in this procedure revealed chronic synovitis with fragments of cartilage and fibrofatty tissue. (Tr. pp. 139-141).

Thereafter, plaintiff was seen post-operatively by Dr. Murphy on April 22, 2003 and May 13, 2003. (Tr. pp. 159-160). At the first post-operative evaluation, it was noted that he was improving as expected, although he reported difficulty sleeping. Ambien was prescribed. His range of motion was improving; his activity status was limited as he was still on crutches. Physical therapy was ongoing. (Tr. p. 160). At the second visit, it was again noted that he was improving as expected and that his progress was consistent with the diagnosis and type of surgery he had undergone. His activity status was still restricted. Vicodin and Celebrex

17

were re-authorized.  Plaintiff was still in physical therapy. (Tr. p. 159).  As of May 29, 2003, Metro Physical Therapy was still recommending that plaintiff was in need of their services for complete recovery.  (Tr. p. 221).

By June 11, 2003, Dr. Murphy opined that plaintiff was capable of performing sedentary work, with limitations of no squatting, kneeling, climbing or excess stress to the left knee.  (Tr. p. 231).  A post-operative report with factual observations underlying that opinion was generated the same day.  (Tr. p. 233). Daypro, Vicodin, Soma and Trazadone were prescribed.  (Tr. pp. 232, 234). Plaintiff continued with physical therapy through June 26, 2003. (Tr. p. 257).

A functional capacity assessment of plaintiff's condition was performed by the Social Security Administration on July 9, 2003. The evaluator found that plaintiff had a severe condition of his knee based upon his past surgeries and the degree of his chondromalacia.  It was noted therein that plaintiff was showing steady improvement and that he should not be totally disabled for a twelve month period following his most recent surgery in April, 2003.  The examiner further opined that, although plaintiff had two herniated discs in back, this condition was not severe enough to constitute total disability.  (Tr. p. 274).

On July 15, 2003, Dr. Murphy noted that plaintiff's physical

18

therapy sessions were to cease.  Plaintiff still reported pain in the knee but there was no effusion, he had a range of motion from 0 to 130 degrees and his muscle tone was improved.  The doctor opined that plaintiff was capable of sedentary work, with no squatting, kneeling, climbing or excess stress to the left knee. (Tr. pp. 284-286).  Plaintiff had a further appointment with Dr. Murphy on September 2, 2003.  Medications, i.e., Daypro, Soma and Vicodin, were again re-filled. (Tr. pp. 281-282).

Dr. Murphy issued an orthopedic report pertaining to plaintiff on March 2, 2004, his next visit after the one on September 2, 2003.  At that time, plaintiff reported worsening of his back pain and stated that he wanted to see a spine specialist.  He continued to advise that his knee was painful, although not as bad as it had been in the past.  At this visit, Dr. Murphy did not feel that any further surgical intervention would be useful as to plaintiff's knee.  He did advise plaintiff again of the need for weight reduction.  As to his back, plaintiff reported bladder-related symptoms that could be related to his lumbar condition.  A neurosurgical evaluation was believed to be in order as was one for pain management.  Dr. Murphy again opined that plaintiff could perform sedentary work with limitations to accommodate his knee and back issues. Soma was prescribed. (Tr. pp. 275-276).

Plaintiff saw Dr. Lucien S. Miranne, a neurosurgeon, on

19

referral from Dr. Murphy on March 19, 2004. Dr. Miranne documented a disc herniation at L5-S1 on the right side with nerve root compression based upon plaintiff's MRI scan from a year earlier. He advised that a repeat MRI was in order to determine if there was further degeneration which could cause cauda equina symptoms as well as bowel and bladder dysfunction, of which plaintiff had complained. He could not say that plaintiff was at maximum medical improvement at that time without these further tests. (Tr. pp. 287-288).

Not forming part of the administrative record, but annexed to plaintiff's cross-motion for summary judgment, are medical records which counsel argues constitute new, material evidence for the Court's consideration regarding plaintiff's condition. The Court notes that these records were generated following referral of plaintiff to these health care providers by doctors whose records the ALJ considered. As plaintiff's compensation carrier apparently decided the providers that plaintiff could and could not see, it is through no fault of the plaintiff that these records were generated during the time frame that they were.

On May 12, 2004, plaintiff consulted with Dr. David Shawa as to his low back and bilateral knee pain. Back flexion was limited by stiffness and pain and extension was likewise decreased. Straight leg raising was negative bilaterally. Strength was 5/5 in

all major muscle groups of both lower extremities.  His gait was normal and he could walk on his heels and toes without difficulty. Lumbar disc disease with radiculopathy was noted as was lumbar facet arthropathy.  Epidural steroid injections were recommended. Plaintiff was given prescriptions for Lidoderm patches, Ultracet, Robaxin and Bextra.

On May 24, 2004, plaintiff received his first epidural steroid injection.  On June 14, 2004, medial branch blocks on the right at L3, L4 and L5 with block intervention to the L4-5 and L5-S1 facet joint were performed as the epidural injection gave plaintiff no relief.  Plaintiff did, however, receive 100% relief from the June 14th procedure, which lead Dr. Shawa to opine that plaintiff would be a good candidate for radio-frequency denervation of the L4-5 and L5-S1 facet joints. On June 21, 2004, radio-frequency denervation of those joints was performed and plaintiff was given a prescription for Vicodin ES. On July 20, 2004, plaintiff reported a 60% to 70% reduction in his right lower back pain, but he then complained of pain on the opposite side of the back.  He did not have any radicular symptoms.  The doctor then wished to attempt radio-frequency denervation on the opposite side to address plaintiff's concerns.  That second procedure was performed on August 9, 2004.  Plaintiff was given another prescription for Vicodin ES.

On September 9, 2004, plaintiff reported that he did not get as good relief on the left side as he did on the right side. On physical examination, plaintiff's gait was normal. Flexion of the back could be accomplished to 45 degrees and was limited by stiffness. Extension of the back was normal. Plaintiff advised that he had been walking one mile. Depression was added to plaintiff's diagnoses. However, plaintiff did report losing thirty-five pounds over the last several months. Dr. Shawa started plaintiff on Celexa and re-authorized Vicodin ES.

By October 5, 2004, plaintiff had diffuse tenderness in the lumbar area of his back. The skin rolling test, which is one of the Waddell's signs for nonorganic pain, was positive when the skin in the lumbar area was rolled by Dr. Shawa. Flexion was accomplished to 45 degrees and was limited by stiffness and pain. Extension of the back was normal. Strength was 5/5 in all major muscle groups of both lower extremities. Straight leg raising signs were negative in the sitting position. Dr. Shawa determined that he had exhausted his resources as far as helping plaintiff and expressed the desire to refer him to Dr. Karen Ortenberg, a pain management and rehabilitation specialist, to assist plaintiff back into the workforce. Dr. Shawa also suggested that plaintiff be seen by Dr. Kevin Bianchini for psychological testing. Celexa and Vicodin ES were re-prescribed.

22

Dr. Karen Ortenberg saw plaintiff on November 9, 2005.   On physical examination, plaintiff's lumbar flexion and extension was limited to 50% of normal.  There was no evidence of lumbar weakness but he reported diffuse tenderness over the entire lumbar region. Motor strength was intact for all muscle groups to both lower extremities.  Straight leg raises were negative in both seated and supine positions.  Plaintiff was able to sit for a thirty minute interview without outward signs of pain or discomfort.  The doctor recommended physical and occupational therapy for plaintiff which commenced and a discontinuation of opioid medications.  At that time, plaintiff had been on Vicodin for two years.  Dr. Ortenberg altered plaintiff's prescriptions to Celebrex, Lidoderm patches, Skelaxin, Klonopin and Lexapro.  Celexa was discontinued.

On plaintiff's next visit with Dr. Ortenberg on December 8, 2004, he reported that he did not receive adequate pain relief from the medication last prescribed and the doctor opined that she doubted he would be able to handle the exercise program offered unless he received better pain coverage.   She altered his medication by discontinuing Skelaxin and Klonopin but added Zanaflex and Ristoril.

By January 10, 2005, it appeared that little, if any, objective improvement in plaintiff's condition could be documented. It was noted that a pain psychology report indicated that there was

23

possibly exaggeration of physical and psychological problems on plaintiff's part. Celebrex was discontinued. Vicodin was added and the dosage of Lexapro was increased. On February 28, 2005, Dr. Ortenberg reported that plaintiff's lumbar flexion had improved to 50 degrees and extension was 20 degrees. Straight leg raises remained negative bilaterally. Motor strength was within normal limits for all muscle groups to both lower extremities. There was no evidence of focal muscle atrophy, spasms or fasciculations. The doctor further opined that, of late, plaintiff had responded well to the multidisciplinary program offered; she recommended continuation of physical therapy in conjunction with pain psychology visits. She further observed that plaintiff had notable improvement in his functional status and reduction in his subjective complaints of pain. Dr. Ortenberg suggested that, upon completion of all physical therapy, a functional capacity evaluation be performed to explore return to work goals. It was noted that plaintiff was working hard to decrease opioid usage. His medications still included Lexapro, Vicodin, Zanaflex, Lidoderm and Ambien.

The first assignment of error specified by plaintiff relates to the medical evidence generated after the hearing before the ALJ which the Court has synopsized above. Plaintiff argues that, had this evidence been considered by the ALJ, he would have been found

disabled.

The Court can order that a case be remanded to the Commissioner to consider new medical evidence "... only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. §405(g). In order to justify a remand, three criteria must be satisfied. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995); Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989). First, the evidence must be both "new" and not merely cumulative of what is already in the record. Szubak v. Secretary, 745 F.2d 831, 833 (3rd Cir. 1984). Second, the evidence must be "material" such that there is a "reasonable possibility" that the evidence would have changed the outcome of the Commissioner's decision. Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994)(citing Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981)). The materiality requirement also contains a temporal element that the evidence relate to the time period for which benefits were denied. Latham, 36 F.3d at 482. Finally, the claimant must demonstrate good cause for not having incorporated the new evidence into the prior administrative record. Pierre, 884 F.2d at 803.

Reviewing these steps, the evidence in question would appear to be "new" because it came into existence after the final decision

of the Commissioner.  Latham, 36 F.3d at 483.  And, as noted earlier, there is good cause for plaintiff not having these evaluations earlier because the employer's compensation carrier was determining the health care providers he could utilize.

However, the Court does not believe that anything contained in these records is "material" to the current inquiry because there is not a "reasonable possibility" that consideration of the factual information in them by the ALJ would have resulted in a finding of plaintiff's disability under the Social Security Act.  While the documents in question establish that plaintiff still had a medical problem after his request for benefits was denied, they do not establish that he was unable to perform sedentary work, with restrictions, which was the issue before the ALJ.

No doctor who rendered medical services to plaintiff, following the ALJ's decision, opined that his back disabled him from performing work at the time that he was seen.  In fact, they establish that plaintiff may have been enhancing his complaints of pain, which is supportive of the opinion rendered by the ALJ. There is no doctor who, at any point, has considered plaintiff to be a candidate for back surgery, even though he clearly has disc degeneration. Nor do these "new" records contain any information supportive of plaintiff's argument that he was per se disabled because he met the criteria of one of the Listings of Impairments

26

at step three of the Commissioner's inquiry. Rather, these records reveal that plaintiff could walk with a normal gait, that he had good muscle strength in all major muscle groups, that he did not have a positive straight leg raising test at any time, that he could walk reasonable distances and that he may well have been exaggerating his discomfort. Further, the ALJ was aware that plaintiff had disc herniations and acknowledged this in his findings. The Court, therefore, finds plaintiff's first argument to be without merit.

Plaintiff's next argument is that the ALJ erred in failing to apply the Listing of Impairments which would have resulted in a finding of disability. Specifically, plaintiff argues that, under §1.04(A) and (C), he should have been found disabled based upon the records of Dr. Charles Murphy, the results of the open MRI dated March 24, 2003 and the report of Dr. Lucien Miranne.

Section 1.04 of the Listing of Impairments provides in pertinent part as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg

raising test (sitting and supine); or   ...

C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpt P, App. 1, §1.04.

The MRI referenced above certainly established that plaintiff suffers from herniated discs at two levels.  However, no doctor has recommended surgery for this condition.   Furthermore, under §1.04(A), since this is a lower back condition, plaintiff must establish positive straight-leg raising tests, both in the sitting and supine positions.  His medical records are 100% in accord that his straight leg raising tests are all negative.   Therefore, he cannot satisfy the criteria of §1.04(A).  Nor can he come under §1.04(C) because his medical records do not demonstrate an inability to ambulate.  Plaintiff has undergone significant amounts of physical therapy and has, at all times, been able to ambulate without the use of a wheelchair or crutches, except immediately post knee surgery.   Further, there does not appear to be any degeneration of the muscles in his legs, which is indicative of the fact that plaintiff can ambulate in a reasonable fashion. Lastly, the newly generated medical records furnished by plaintiff indicate that he could walk one mile in September, 2004.  Accordingly, the Court finds this second argument without merit as well.

Lastly, plaintiff argues that the ALJ improperly evaluated his

28

complaints of pain because he did not have the new medical records to consider at the time of his decision. The Court notes that the responsibility of weighing the evidence and determining the credibility of witnesses' testimony lies with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Wren v. Sullivan, 925 F. 2d 123, 129 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). In addition, the law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced. Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing Jones, 702 F.2d at 621 n.4). The evaluation of a plaintiff's subjective symptoms is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. Harrell, 862 F.2d at 480. The ALJ may discredit a plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so. Anderson v. Sullivan, 887 F.2d 630, 633 (5th Cir. 1989)(citing Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir.

1988)).

In his opinion, the ALJ referenced Social Security Ruling
("SSR") 96-7p in discussing why he assigned diminished weight to
plaintiff's subjective complaints.  Specifically, the ALJ found
that the description of the activities which plaintiff was able to
perform in physical therapy, i.e., riding a bike, leg presses and
straight leg raising maneuvers (Tr. p. 256) was inconsistent with
plaintiff's testimony that he did nothing but lie down all day.
(Tr. p. 33).  The ALJ also found that there was no objective
corroboration in the medical records for claimant's allegations
that his back "locks up" or that his legs gave out, causing him to
fall on his face.  At the time of the hearing, only conservative
management of plaintiff's back pain had been undertaken.  Based
upon this information, the ALJ was correct in the decision which he
rendered.

As the Court understands it, plaintiff is arguing that, had
the ALJ had the benefit of the "new" medical records, he would have
established that his pain was disabling.  However, as noted
earlier, those medical records indicate that plaintiff was still
able to undergo extensive physical therapy, which the ALJ found
indicative of a non-disabling level of pain.  Furthermore, the
report of Dr. Megan Ciota, following psychological testing on
December 7, 2004, revealed an "indication that intention[al]
exaggeration of physical and psychological problems is possible."

30

(Plaintiff's memo, Exh. A, Report, p. 9).  Accordingly, the Court discounts this assignment of error as well.

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this 14th day of March, 2006.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE